Good morning, Your Honors. My name is Ben Lechman. I represent the appellant Mark Levine. I'd like to request about four minutes of rebuttal, if that's okay. When Henry Ford first introduced his Model T, he gave the famous quote that consumers could have it in any color they wanted as long as that color was black. In this case, the jury was allowed to consider independently the defenses of Mr. Levine and Mr. Leonard just as long as one of them was guilty. This is a case about mutually exclusive defenses. Mr. Levine. HENRY FORD What was that last few words, Your Honor? BEN LECHMAN This is a case about mutually exclusive defenses, Your Honor. HENRY FORD Oh, okay. All right. BEN LECHMAN Mr. Levine's defense was that all the defendants in this case conceded, I think, that there was a fraud that was perpetrated by Mr. Itzkowitz. Mr. Itzkowitz testified for the government. He said, that's true. I, in fact, orchestrated that fraud. All the defendants agreed with Mr. Itzkowitz that he, in fact, did orchestrate that fraud. It was Mr. Levine's defense that he didn't believe a fraud had occurred because he had disclosed everything regarding his role to Mr. Leonard, his counsel, and Mr. Einhorn, another one of his counsel. It was Mr. Leonard's defense that there was also a giant fraud, but that he as attorney was misled. In fact, the fraud was so pervasive that it even fooled an experienced attorney like himself. The government, in its briefing, it said, well, there was a sort of third theory that the jurors could have acquitted everyone on the fact that there was no fraud. That theory wasn't advanced by anyone in this case. So this case is a lot more like this Court's prior decision in Mayfield, where there was clear evidence of a crime. There were drugs found in a home. There was no dispute that the possession of that, the possession occurred, that it was illegal, and that a crime had occurred. It was just a question of which defendant was guilty. Same thing in this case. More complicated, but really it boils down to the same thing. There was a fraud that had occurred. Was Leonard guilty because he knew about the fraud? Excuse me. Was Levine, Levine's defense was that he was not guilty because he disclosed everything to Leonard. Leonard's defense, and that was his only defense, was reliance on counsel. It was the only theory upon which the jury was instructed on Mr. Levine's behalf that they could acquit him. The only exclusive method, aside from nullification, that could have resulted in Mr. Levine's acquittal would have been a belief that he disclosed everything to counsel. Roberts. Well, what about the concept of proof beyond a reasonable doubt and the idea that if the government doesn't prove their case beyond a reasonable doubt, it can't convict anybody? That would be true in a case where you didn't have defendants acting as second prosecutors in the courtroom. But in this case, you had, through my brief, I tried to take out many of the experts, what Leonard's counsel did. But with all due respect to government counsel, I submit that he was the most effective prosecutor in the courtroom, maybe because he pushed the limit more than government counsel would have been able or willing to do. But in this case, he brought up many times, you know, during his questioning of witnesses, look, there was a giant fraud. People were misled. They said, Mr. Leonard, his attorney, wasn't told of these things. And then he went and then he contrasted Leonard's advice with Mr. Einhorn, who was the attorney who wasn't present and upon whom Mr. Levine also relied, and said, Mr. Einhorn was a giant crook. In fact, part of the fraud, and I think this is a big part of why Mr. Levine was denied a fair trial, was that part of his fraud included invoking your right to silence when you were asked any question. And so the jury was told, and when the government in their brief had said, well, didn't the district court cure this with curative instructions? And I would say no. But the district courts, as careful as Judge Moskowitz normally is, I think that these instructions actually exacerbated the problem. Because after these long exchanges about basically the allegations during the regulatory investigation were the exact same. It was cookie cutter from what was really pled in the indictment. It was you were asked about did you have an interest in this. Were there material misstatements, you know, made in this investment offering? And in fact, you were told not to answer an advice of counsel, and you didn't. Well, the curative instructions, at least those mentioned by the government's brief, were that the jury was instructed they could consider this only as to the issue of intent. Well, when someone invokes the right to silence, and the jury is told you can consider this on someone's intent, what their intent is, I think that that exacerbates the problem. It really functioned as a comment on Mr. Levine's silence. One of the cases I cited in my brief was a district court case of Moldo, which said that Mr. Einhorn's representation overlapped in the regulatory investigation throughout to the inception of the criminal proceedings. That was what the district court held there. The charges in this case are really overlapping, too, because they essentially allege the same facts. And so you have basically the same attorney giving the same advice, and the jury is told that they can consider this advice as to the defendant's intent. And I think it's improper under, I think, this Court's decision in Guam v. Valoria and all the other Fifth Amendment jurisprudence. I think it infringed upon his attorney-client in regard to this trial, because basically it's invading the province of his legal advice. Were you the trial attorney? I beg your pardon? Were you the trial attorney? I was not. Just before we leave this issue, I don't recall anybody raising the issue, but I presume that in this case all of the motions for severance were not only made pretrial, but through the course of the trial? That's true. And one of the arguments that there are two points I want to raise before we leave this issue, and one is in response to Your Honor's question, the government said, well, look, this is an opportunistic motion by Mr. Levine. He didn't raise it prior to trial. I have a couple of responses. The first is this. Prior to trial, Mr. Levine filed kind of a general boilerplate motion. In these complicated trials where there's many defendants, it's really unclear to everybody how the evidence is going to shake out, sometimes even until after the first week of trial. This is a four-and-a-half-month-long jury trial. So the motion for 12b-5 purposes, I think that's the right provision in the rules, it was already made. At that time, it looked like Mr. Leonard Levine would be traveling along the same path. Almost as soon as trial started, it became clear that that was not the case, and it was clear to everyone. At that point, Mr. Levine, I think, raised the argument 16 times, I counted from the record and I put it in my reply brief, 16 times, Your Honor, I'm moving for a mistrial, I'm moving for severance. One of the questions I anticipated this Court might ask is, well, what about judicial economy? I mean, this is a very long trial. One of the things I would point out is at the time this happened, there was already a severed trial set in this case for Defendant Rodney Scott Shane. That was scheduled to take place later. He ultimately ended up pleading guilty, but there was already a trial. I think that's why Judge Moskowitz took several times to consider it seriously that he would, in fact, perhaps grant a severed trial. So it was raised, and my final point on this issue is that the government during the trial never said, hey, wait a minute, it's too late to raise this. So because they didn't raise that at the district court below that it was too late, I think they waived their chance to raise it. Well, I don't think it's ever too late. I agree. Okay. The other issue is you don't know what's going to happen until it happens, and that's part of the requirement, as I understand it, is that you can't sit around and move at the outset and then see the trial going the way you think is okay and then not renew it and then say, well, it should. Anyway, the record on this puts the issue squarely in front of us.  Thank you, Your Honor. The three things I get the picture. The last thing I want to mention regarding this is one of the arguments the government made in their brief was, you know, what about substantive trial rights? What substantive trial rights were infringed by having this joint trial? And I would — and they said, well, would the evidence have been different in a single trial? And I said, yes, it would. The three main substantive trial rights were the fact this comment on Mr. Levine's silence, where Mr. Leonard's counsel, in fact, in closing argument said, look, it's a credibility contest. Who are you going to believe? My client testified, you know. And the rest of the trial, he was saying, look, the guilty people, they invoked their right to silence. The lack of an opportunity to present an individual defense, I think, was infringed by this, because at the end of the case — That last thing you just said, was that — were you quoting actually what was said during closing argument? The actual quote's in my brief, and I think he said, who are you going to believe? It's an issue of credibility. Are you going to believe Mr. Leonard when he gets up here on the stand and testifies? The same man that said that, that same man is Mr. Leonard's trial counsel. He's the same man who, during the course of this trial, was saying, and they told you to invoke, and you didn't say anything, and they told you to invoke, and you didn't say anything. They told you not to testify, not to say anything. And then that same guy at the end of the trial turns around and says, ladies and gentlemen, my client testified. This is a credibility contest. I mean, I think that sort of thing just is exactly why we have the case law that we do regarding, you know, Griffin and Doyle. He was — Mr. Leonard was — or Mr. Levine, excuse me — was denied an opportunity to have the jury consider his defense in an individual capacity. This is — at the end of the case, the jury's left with an instruction for Mr. Leonard that says, well, the only way Mr. Leonard didn't know is if — because he not only concedes there's a giant fraud, I mean, he's actively really helping the government prove that there was a fraud to show that it was so pervasive, because it would have to be very pervasive to fool an experienced guy like Mr. Leonard. That's Mr. Leonard's defense. That's a jury instruction the jury's left with. The only way he could not know is if things weren't disclosed to him. Mr. Levine's defense is the only way he could be innocent is if he disclosed everything to Mr. Leonard. So this theory — the government's theory of, you know, this interning incompetence, I mean, that wasn't advanced by anyone. I mean, this argument they make is really infinitely regressive right down to the jury's nullification power. And finally, I think that Mr. Levine's right to effectively cross-examine under the Confrontation Clause was infringed here because of all these statements brought out by Leonard's counsel regarding what Einhorn allegedly said. So I think that is what I would have to say about this severance issue. And I guess the only other point is that the government cites the Supreme Court case in the FIRO to say that there needs to be a curative instruction. I think the curative instructions were bad here. And the FIRO actually said, the Supreme Court said, these are the kind of cases where the prejudice is actually the most acute. In terms of the Confrontation Clause, I think these statements are testimonial. There's two new cases that aren't in the party's briefing, and I don't know if the Court's aware of them, and that is, I think, Jensen, which was issued, I want to say, about a week ago, and Bridgeforth. I don't have the cites for Your Honors. And I wasn't sure, since the Court is so current, they had this morning's cases. I guess I didn't presume wrong. Kennedy. If there are cases you want to call to our attention, we have this mechanism that you can use the sheet that the clerk will provide to you, and you go ahead and cite your cases, and that will get to us. I don't have the cites of those cases. I'll provide them after the argument. What do they say? They're actually kind of bad for Mr. Levine, because what they say is that in Bridgeforth, this Court, with not a whole lot of analysis, said that co-conspirator statements are, they're not testimonial. And they're just relying on a line of dicta, I think, in Crawford. The second case is a little bit more problematic. It's Jensen. And in that case, a man named Taylor was killed by Jensen. Before he was killed, he had confessed to criminal involvement with Jensen. But he had confessed to his attorney. And so during Jensen's trial, they brought out Mr. Taylor's statement, the man he had killed. Mr. Jensen said, look, that's confrontation. Now, I think that's forfeiture by wrongdoing. If you kill a man, you can't later on complain about his testimony being used against you as a violation of confrontation clause. But this Court didn't analyze it that way in the text of the opinion. The way this Court analyzed it was, and I don't remember the author of the opinion right off the top of my head, was they said that it wasn't testimony. His statements to an attorney weren't testimonial, because in this context, you couldn't have an eye towards litigation. One, it wasn't a government agent. And two is, because you believe the attorney-client privilege will shield this conversation, you wouldn't be having an eye towards litigation. I think it's contrasted with the situation here, where when the – and this is an important distinction I want to make out about these statements in terms of the crime fraud exception and the confrontation clause. I think you have two separate sets of statements. In the first clause is a statement to invoke the right to silence. I don't think that can ever be a co-conspirator statement. I don't think that could ever be part of a crime fraud, because the Fifth Amendment right to not say anything is, you know, it's just – it's such a central part of our system of justice. It distinguishes it from inquisitorial practices. I don't think that can ever really be part of the crime. You always have that right not to say anything. Those class of statements, I think it's beyond the pale. I think it's a violation of the confrontation clause, and I think it's a violation of the attorney-client privilege. The second set of statements is these statements regarding the man on the deal regarding the investment programs. I think those are – and I'm not saying that – I also believe those are testimonial. I believe they're testimonial under the Sixth and the Tenth Circuit's decisions, excuse me, in Cromer and Summers, because these statements are made with an eye towards litigation. At that time, the defendants are arguably concerned about pending investigatory – regulatory investigations, about impending litigation. So they're going to the attorney saying, look, what do we need to say in these matters? And so I think under that analysis, these statements are testimonial. Wasn't there a recent Supreme Court decision on the confrontation clause? I know that Hammond and the other case, I think, regarding 9-11 calls are pending, but if there's a case that's newer, I'm sorry, I'm unaware of it, Your Honor. I thought that Scalia had come down with an opinion on the confrontation clause. Your Honor, I'm sorry. If it's one of those two decisions that was issued within the last day or so, I'm unaware of it. No, it was, I think, last week. I'm not familiar with that, I'm sorry. Time goes by fast. The older I get, I realize that's true. I'd be happy to submit supplemental authorities in that regard. Let me see if this thought is occurring to me. In your argument in support of severance, you're saying either the lawyer or your client had to be guilty, right? Right. And at the same time, you're saying, and throughout the course of the trial, I take it your client was saying the lawyer is guilty. He's a liar and he's guilty. Yes. Well, he's saying, yes, that's true, because I disclosed everything to him, and he's obviously in with its wits, and I didn't realize that. And at the same time, he's relying on whether it be a pure defense or at least a negation of an intent to defraud, the fact that he has conferred with this crooked lawyer. Is that, is he simply what he's telling the jury? He's telling him, I conferred with this lawyer. Everything I said was above board because I believed what he said. If he turned out not to be honest, I didn't know that. Okay. I think the instruction is as long as you rely on good faith in his advice and you're candid with him, then you're entitled to the instruction.  It negates your intent. It's an awkward position to be in, at least, to say the least, to say I have this defense of having disclosed to this lawyer that now, members of the jury, you know is a crook. I guess that's about right. You only know he's a crook because of his defense now, which is they didn't tell me anything. I got you. I got you. He's saying that your client is the evil one because he didn't make a full disclosure to the lawyer. Right. Okay. It is an awkward position, but it's only awkward because of the stance taken by the attorney at the trial. In terms of, I don't know if the Court has any other questions regarding the other issues. Otherwise, I'd save my time for rebuttal. Well, did you address the sentence? I haven't, Your Honor. I think a full remand is in order here. I think normally it's rare that a district court says anything about the, about how it feels about the guidelines. And in this case, I mean, I think it was pretty clear. Judge Moskowitz said that he felt constrained by the guidelines, and I think he made an explicit enum. What did the co-defendants get? What did Iskwitz get? Iskwitz got 78 months, I think. Do you know what the others got? One of your clients' concern is that everybody else got these low sentences and he got 25 years. He did. The highest sentence, I believe, for any other defendant was, I think, for the other defendant on appeal, Mr. Morris. I think he received somewhere around 14 years. Mr. Peek, I think, is more familiar. But, like, Rodney Scott Shane received 37 months. It's completely out of the question. So he got twice as much as anybody else? At least twice. In many instances, almost ten times as much. Okay. Great. Okay. I'll save you some time for rebuttal. Thank you. One of Your Honors, may it please the Court. I'm Assistant United States Attorney Steve Peek, and I, along with my colleague, Assistant U.S. Attorney Andy Shopper, will be presenting the case for the government. I will cover the severance and the sentencing on remand issues. Mr. Shopper will cover the crime, fraud and confrontation issues. Your Honor, I think part of the problem here is Mr. Leckman was not the trial counsel and I was, and he doesn't have a very good understanding of what actually happened at trial. There was a 75-plus volumes of trial record and about 15 in pretrial proceedings. It's obviously a lot for somebody new to the case to pick up. But this is a case for three years. Mr. Itzkowitz and Mr. Levine and their co-conspirators defrauded over 3,000 victims of $50 million, thereabouts, through their offering of 12 fraudulent securities. Many of these victims were senior citizens, and Mr. Levine, along with Mr. Itzkowitz, each took out $1.8 million from those proceeds. The government investigated the case for about three years. There were 20 pre-indictment guilty pleas. Twenty defendants were then indicted. Thirteen of those defendants pled guilty before trial. Six went to trial, one died. Of the six who went to trial, Mr. Levine was convicted, Mr. Morris, a salesroom owner, was convicted. The jury hung on Mr. Leonard, the lawyer, and three salespeople were acquitted. The jury was able to weigh through all the evidence and come to those conclusions. Fifty-four witnesses testified at trial. Didn't they hang on another person? No, sir, just Mr. Leonard. Fifty-four witnesses testified at trial. There were hundreds, I think 1,200 exhibits were admitted. Was it a woman assistant? I'm sorry, Your Honor? A woman assistant? What's her name? I'm sorry, Your Honor. A woman what? Assistant. Wasn't there another woman? That was the question. Okay. A woman assistant, U.S. attorney? I'm not following the Court's question. No, no, no, no, no. No, there was no other. The only person that the jury hung on was Mr. Leonard. And then the Court sentenced Mr. Levine to 292 months. And to answer the Court's question earlier, Mr. Levine did get the highest sentence. He was convicted after that long trial. Mr. Morris, as Mr. Lechman said, I think got close to 14 years. And all the other defendants were in the range of 78 months down. They were all cooperated except for Mr. Shane. Mr. Shane did go to trial, was scheduled to go to trial later, and he ended up getting somewhere in the three- to four-year range. But all the other defendants got reduced sentences primarily through their cooperation. Esquitz was at 78 months? Yes, sir, he was. And, Your Honor, the Court – there's really three factors why the Court made the right decision on the severance. First of all, Mr. Levine asked – let me repeat that. He asked to be tried with Mr. Leonard. He filed no written severance motion for Mr. Leonard pretrial. As the Court indicated, there were lengthy five months of pretrial hearings leading up to the trial in September 2002. We had many, many hearings on severance. Mr. Levine specifically asked in several hearings to be tried with Mr. Leonard. He specifically said, we see no reason why these attorney-client issues are going to be a problem here. The Court made specific findings because there were – with the multi-defendants involved in this case, there were lots of issues of finger-pointing. And he made very specific findings that Mr. Levine – and we set these out in our agree there were no issues between them. Secondly, their defenses were not mutually exclusive. In fact, they were mutually supportive, as I will explain. Mr. Iredale – that was Mr. Leonard's attorney – he made an opening statement, really the first opening statement. And he used four themes that Mr. Greenberg, Mr. Levine's attorney, basically followed through throughout the trial. First theme – and by the way, in Mr. Leonard's opening – Iredale's opening statement for Mr. Leonard, he only mentioned Mr. Levine's name twice. The four themes that Mr. Iredale used were that Iskowitz had many attorneys, which he did, and the evidence demonstrated that. Second, that Mr. Leonard operated in good faith. Third, that Iskowitz was a manipulative liar who abused and betrayed his own people. And Mr. Greenberg, Mr. Levine's attorney, jumped on that and used that same theme. And finally, that the cooperators all had something to gain, better sentences, and they were not believable. Mr. Greenberg adopted those same four themes. Those four themes were followed throughout the examination and cross-examination of witnesses. They were adopted in closing. For example, the government put on evidence about a separate fraud that had happened two years earlier in 1992-1993 called universal wireless. We believed that that demonstrated the relationship between Iskowitz, Levine, and Leonard. The defense with Mr. Iredale for Mr. Leonard and Mr. Greenberg for Mr. Levine used that same argument, but they flipped it around. They said, no, no, no. This was a good business gone bad, as Mr. Leckman argued in his brief. Mr. Leonard at that time gave an opinion letter to Mr. Iskowitz and Mr. Levine. The only opinion letter he rendered for the next six years, which he said, I'm not a securities lawyer, but these look good to me, these general partnerships. That is the one piece of evidence that Mr. Levine focused on later, that I way back four years earlier believed that these were not securities. There was no other evidence adduced to trial about any communications whatsoever between Mr. Levine and Mr. Leonard. As a matter of fact, in the closing argument, Mr. Greenberg mentioned this opinion letter that Mr. Leonard had given earlier as the basis for this good faith argument. Specifically, in the cross-examination of Mr. Leonard, Mr. Greenberg asked him, did you ever meet with my client? And Mr. Leonard said, no, during the offerings of these 12 offerings, I never met with Mr. Levine. I always met with Iskowitz. How was that important? Because that supported both Mr. Leonard's argument and it supported Mr. Levine's argument. Because Mr. Levine basically said, I relied on Ira Iskowitz. He talked to all the lawyers. He came back and told me what they said. I acted in good faith because I thought the advice that they gave was everything was on the up and up. It also benefited Mr. Leonard because he could say, you know, Ira gave me the false information. Excuse me. There was no evidence that Leonard had any, that Levine had any other discussions with lawyers. Levine did not testify. There was no testimony by any other witness about Levine's contact with lawyers. The only evidence that was submitted about that issue was by Ira Iskowitz. He testified about a meeting he, Levine, went to in the fall of 1994 with Mr. Einhorn, where they disclosed to him the nature of their fraudulent scheme and how they were going to pay him successfully over the next few months, that there was this straw man, it's what they called the man on the deal, who was a figurehead who would be represented to the public as the person in charge of this corporation, when in fact, they were paying him on the side and they were controlling the operation. That was the only evidence that was presented to the jury about this whole issue of Levine and Einhorn. No other evidence came out. Moreover, all the evidence that came out about Einhorn's testimony, Einhorn's statements to the co-conspirators, came out through the government's witnesses first, and then it came out in cross-examination. And the court made two multiple findings, but two I can cite for the court, that this evidence would have come out exactly the same in a separate trial, and it came out through the government's witnesses first. I would cite volume 10, 3836 to 3837, and volume 49, 14646 to 47, and this is in our supplemental excerpts of 817 and 818. Mr. Leckman claims that this advice of counsel was his only theory. Interestingly, Mr. Levine never asked for the advice of counsel's instruction. Mr. Katz, who represented Mr. Morris, was the one who asked for that, and there was a colloquy in the record that I can cite for the court, where Mr. Levine's counsel, Mr. Greenberg, said, I'm not asking for this advice of counsel's instruction, but I don't oppose it. Let me tell you where that is. That's in volume 55, 16733 through 16737. I'm sorry, Your Honor, that's actually volume 51, 15417 to 15449. Moreover, in Mr. Greenberg's closing argument, he never even referred the jury to the advice of counsel instruction. That wasn't his theory. His theory was good faith, and he referred them to instruction 34, which was good faith, and he referred them to the knowledge, having a requirement that each defendant had to have knowledge of the scheme. That was instruction 36. That's in volume 55, 16733 to 16737. He wasn't interested in the advice of counsel. He did mention the fact that his client had received advice of many lawyers, as Mr. Leonard's counsel said. Mr. Leonard's defense was Ira Itzkowitz had many lawyers, you know, and I was just one of them. I only got a little bit of information from Mr. Itzkowitz. I did very narrow work for him, and everything he told me was that the business he was running was on the up and up. That supported Mr. Levine's defense that all these lawyers told Ira everything was good. That's what Ira told me. So Ira misled me. Both of them pointed the finger at Ira Itzkowitz as being the bad guy here. They were not pointing fingers at each other. Excuse me. Mr. Greenberg, in his closing argument, made no comment about the reliance on his advice of counsel by Mr. Einhorn. In fact, Mr. Einhorn's name came up only twice in his whole closing argument, and it was contextual. It was in the context of his describing Leonard's testimony at trial, where Leonard had said that he had not met with Levine during the course of this scheme and that he had only met with Ira when Ira was coming to and from That's very instructive. Your Honor, not only were these defenses not mutually exclusive, they were not even antagonistic. And Mr. Levine's attorney, Mr. Greenberg, specifically acknowledged that to the court on 11-2502 at volume 37, 11510 to 11511 at our supplement excerpt 681-82. And he was right when he said that, because both Iskowitz, or excuse me, both Iredell on behalf of Leonard and Greenberg on behalf of Levine specifically accused Iskowitz of lying and implicitly lying to Levine. Levine's defense, as argued in closing, is that the advice had been given to Iskowitz and then passed on to Levine by many lawyers, and that's what Levine had relied on. Moreover, for different but complementary reasons, Iredell and Greenberg each identified these lawyers, and it's ticked off. They named them both in their closing arguments. Greenberg did it because he wanted to show that the information Ira passed him was coming from lawyers. Leonard wanted to do it because he wanted to show that he was just one of many lawyers. It's very important to note, Your Honor, with respect to these mutually exclusive defense arguments that Mr. Lechman raises, that no lawyer, not Mr. Greenberg, not Mr. Iredell, and none of the other three lawyers that were in the case, argued anything about if you believe my defense, you have to convict this defendant, or if you convict that defendant, you have to acquit mine. That was not argued by anybody. How come there were 16 motions to sever? Your Honor, that's correct. There were, I don't know about the 16. I mean, I went through the citations in Mr. Lechman's brief, and several of them I couldn't find any reference to Mr. Greenberg making that motion. But I know the six, whatever the name. He did make it. But he also made it against Mr. Morris' from time to time. This was a long trial, very contentious. Mr. Itzkowitz, or excuse me, Mr. Greenberg and Mr. Iredell did not get along very well with Mr. Katz, who represented Mr. Morris, and there were occasions where everyone was moving to be severed from everyone. The Court, every time this came up, the Court went through lengthy hearings outside the presence of the jury, where he ticked off all the evidence that had come in, and he said, there's no basis for this. And I would ask the Court to look at Volume 49, 14646-47, where the Court on 12-1802, at the conclusion of the evidence-taking, when the defendants moved to renew their severance motions at the time of the trial, 12-129, where the Court specifically said, I'm convinced at this point that notwithstanding the arguments of alleged differences in trial strategy and point of view, that this really hasn't turned out to be a case where the presentation of any particular defendant has, in fact, given the evidence presented, prejudiced any defendant. One defendant may have pointed out the evidence that there's already there or that the government has or could put in or did put in, so the evidence, they didn't offer anything that could otherwise have not come in by the government. I really think, excuse me, I think there really is not any inconsistencies or prejudice to any defendant. There were legitimate fears, but they were not borne out in the record after all was said and done. This is a case why the abuse of discretion test is so important, because these are fact-bound decisions. All of you have been district court judges. You know how important it is to sit there, see the evidence that the jury receives, make your own assessments of how it's being viewed, how people are coming across. And he made very calculated, determined and conscientious decisions that there was no prejudice here. Your Honor, I'm sorry. Yes, sir. I didn't say anything. I know that your colleague only has 5 minutes and 12 seconds left. Yes, sir. I'm ready to move on, so let him talk. Thank you for looking out for me, Your Honor. May it please the Court. I'll be dealing with the confrontation and crime fraud issues. And I think that the analysis of both of those issues begins and ends with the fact that the attorney, Irving Einhorn, was a co-conspirator in this case. And because he was a co-conspirator and the judge found that his statements were in furtherance of a conspiracy, they were not testimonial. And because this was a co-conspirator trying to protect the conspiracy, there was reasonable clause for the judge to find that his services were being utilized in an ongoing fraud. Now, the Court made very specific rulings as to Einhorn's role as a co-conspirator. Those rulings can be found at Volume 6, 2236 through 2242, and Volume 17, 5951 through 55. And he basically says that Einhorn had told them to hide assets, to not put things in their own names. He was aware of the fraudulent nature of their deals, that they were selling securities, and that he was an insider in this organization. At one point he points out that the attorney, Leonard, was used for the more mundane tasks, but when they really needed an insider who was familiar with the scheme, they used attorney Einhorn. And also the fact that the parties continued these offerings after he was giving advice and during the course of his advice. This scheme had begun before he entered into the conspiracy, and it continued throughout his involvement. What happened to Einhorn? He never was prosecuted. He was never prosecuted. You may need to call Mr. Peek back up to give you the exact reasons of that. He wasn't prosecuted. He obviously wasn't sentenced, and he's fine. Right. There was extensive discussion in the record about the government's interest in prosecuting him, but ultimately the decision was made not to name him in the indictment. You still view him as a co-conspirator. That is correct. And as did the judge. And the judge's ruling on that issue is supported both by the context here, which is that the reason that Levine and Itskowitz used him as an attorney is that they knew he was familiar with the workings of this fraud because he had represented other co-conspirators. Are you saying that Einhorn was more culpable than Leonard? Than? Than Levine? Than Levine? I guess Leonard was the other lawyer, right? Leonard was the other lawyer, yes. I would say Einhorn. That's right. Hungary was the other lawyer. Yes. Yes. They had used him because he was familiar with the workings of this scheme because he had represented other co-conspirators. He was aware that the previous projects had been shut down by the SEC, and there was extensive testimony by Itskowitz that the judge relied on regarding Einhorn's role in this conspiracy, and he found that it was corroborated by a number of other witnesses, co-conspirators and cooperating witnesses, Lopukhsinski, Engelhardt, and Widmer. And just to do the highlights from their testimony, which corroborated Itskowitz regarding Einhorn's co-conspirator role, Lopukhsinski said that Einhorn had advised them not to have anything in their own name, to not put any cash in the bank, and to move their assets offshore. He had told them that this was, that Touchdown 1 was going to be deemed a security, and he had said that Einhorn's specific job was to take care of the love letters, which were the cease and desist orders. His role in the conspiracy was to delay regulatory action long enough for them to make their money and then switch into another I.O. before the, so that when one project was shut down, they would already have another one up and going. There was a lot of overlap between these offerings. Did they receive the kind of monetary benefits that? He was paid, Einhorn was paid $30,000 in cash. And there's testimony about that, that he preferred to get his money in cash to stay under the radar of Federal investigation. And so he was, he had a very, very substantial stake in each of these offerings. And I think the fact that the testimony was that he was doing it in a manner so that his illegal role would not be evident to authorities. Are you addressing the sentencing issue as well? Mr. Peek, I think, addressed that at the beginning. Yes, but. So Einhorn was the brains behind all this? Actually, Einhorn's role, the brains were Itzkowitz and Levine. These were the people at the top of the pyramid. They used Einhorn as the person to delay regulatory action. And there's a lot of testimony about that. He did all that for $30,000. Per offering. Per offering. Per offering. Which is how much? I believe there were 12 offerings over the course of the indicted conduct. He still got a lot less than the 1.8 million. That's probably correct. Yes. Of course, I mean, we're not. There isn't a lot of evidence in there about. But you know he got 30,000 times 12? I'm sorry? Do you know he got 30,000 times 12? All we know is that that was what his rate was, and we were told that the payments were made in an envelope that was sealed and brought to his office in each occasion. But all of this wealth, this $49 million that this defendant is ordered to make restitution of, $49 million, I take it that not all of this wealth has been destroyed in some fashion. It's someplace. I think a lot of it actually has been. They were spending it as fast as they could because they realized that it all might end one day. It's your version or your view that it is all spent rather than secreted someplace? There was a receiver appointed in this case, or no? Not in this case? I'm not certain about that, Your Honor. Your Honor, can I respond to that? Yeah. There were receivers appointed in the parallel civil cases filed by the FCC and the FTC, but not in criminal cases. Okay. But I take it the fact that there's a $49 million restitution order in this case means that very little, if any, of that wealth has been recovered. Very little of that money was – all of it was spent, Your Honor. Okay. There was no money to be found. None of those victims are going to get any of that. Very well. Well, I still have a hard time figuring out where that $49 million went. We've accounted for 1.8 times 2. That's 2.36. Plus the attorney got a half a million. That's 4.1. Where's the other $47 million? Your Honor, this organization had 500 salespeople across five states. They had to pay commissions. Most of the salesroom owners earned between $500,000 and $1 million. They paid – there were many salesroom owners, many salespeople that they ended up paying, so the money just was spent. Over a three-and-a-half-year period, it was spent, and that all came out of trial. It was basically stipulated to, and those are in our supplemental excerpts. So Levine is to repay it back? Is that the idea? Well, each of those defendants all had huge restitution orders. Mr. Squids did. All of his cooperating defendants all had huge restitution orders. So unless someone wins the lottery, there will be no money to be repaid. I believe my time is up, Your Honors. Thank you very much. Very well. Wasn't there a recent Supreme Court case, the Confrontation Clause? I heard you say that to Mr. Leckman. Yeah, I don't – if there was, I don't think I've read it. It may have come across our email system. Thank you, Your Honor. All right. So you've got three minutes and – three minutes and 18 seconds. I still haven't read that case yet, Your Honor. I'm sorry. You're very fast. You get in more words for Bennett than anyone I know. I'm just trying to give you your money's worth, Your Honor. Speaking of that, I'm court-appointed. So in terms of Mr. Levine's financial resources, I'm not costing him anything. I don't think he has the funds to pay for anyone. I think some of the testimony in trial was that a great deal of funds were used for advertising and for office space. So it was spent on, I think, on a lot of physical plant type of things. I'm not saying that's where all the money went, but I think a great percentage of it did. In terms of Mr. Einhorn's money, I think during the Moldo litigation, that district court opinion, that I cited regarding his role as part of the criminal representation, the receiver sued Mr. Einhorn to recoup some of his legal fees, and I'm not sure the exact amount. I want to say it's about $108,000, $120,000, something like that. So and I think that's part of, at least I think the Court had a concern, I do, that someone who had a storied career would really risk all that for what in relative terms is not a great deal of money in comparison of someone's actual, if they're good standing, their legal career. Mr. Einhorn obviously — What's your point there? I didn't follow. Well, my point is, I think that it's Einhorn — You're saying he wasn't a conspirator. I'm saying that there's a pretty — there's very scant evidence of this. The evidence that we have about this, I know he says, well, it's backed up by what these other people said, but they're all paid — their testimony is paid for. In terms of what Iskwood said, after he pled guilty, after he cooperated, agreed to work with the government, he went to the probation office, and they said, what happened at this meeting, this meeting that we're talking about? And he said, I went there with good faith. I went there to get legal advice. I wasn't in any of the fraud. When trial comes and now he needs to pony up, he changes the story completely. So I just think it's a pretty thin read to say, this guy who has a storied career, he risked it all for $100,000. How do we know that? Well, we can believe this guy who's already lied about it once and who actually, you know, was caught in lots of lies. What's Iskwood's motive to condemn Einhorn? I think because it helps defeat the good faith claims of other defendants, including Mr. Levine. And if Einhorn was so guilty, if he's so culpable, as we were sitting here today, I don't think he would be standing. I looked up, he's appeared before this court, and apparently he still can appear before this court. He's still in private practice. He hasn't been indicted here or anywhere as far as I know. So if he's that culpable, I would think that some process, you can indict Tom DeLay, but you can't indict Irv Einhorn? It seems unreasonable to me. But the trial judge found that he was a co-conspirator. And we have to find that that was an abuse of discretion. I think you do. But I think here's why I think that you can. Prior to Crawford, basically we analyzed the Confrontation Clause synonymously with Hearsay Rules. But I think what the Supreme Court said in Crawford is, look, that's a mistake. We value this Confrontation Clause. We think it's important. We think that it's got to be protected. This Court, in a case called Murdoch v. Castro, which was decided, like, last year, had looked at a situation where the attorney-client privilege was at odds with the Confrontation Clause. And this Court said, look, evidentiary rules have got to go when it comes down to the two butting heads. And so I think that's what you have here is the crime fraud exception, I think you need basically almost anything to allow it to be invoked. Well, then there goes the attorney-client privilege and there goes the Confrontation Clause based on this little tiny thing that's unreliable. That just doesn't seem like it squares up. So I think it is an abuse of discretion. I wanted to say one more quick thing about severance. I think government counsel really doesn't do the facts justice. And I think even though I wasn't trial counsel, I have a pretty good command over them. And they adopted, actually, my statement of facts as part of their brief. Mr. Leonard's role was a lot bigger than what he gets a credit for. Mr. Leonard, there were several weeks of 404B testimony regarding the universal wireless offering. That, those offerings were very similar to the offerings at issue in this case. In fact, as Moskowitz said, I find that these are basically the genesis. Mr. Leonard worked closely with Mr. Levine during all those offerings. So this is not a situation where there was just the opinion letter, which was mentioned in closing argument. They had had years of working together. He had represented Mr. Levine in prior depositions. This is what Mr. Leonard did in these offerings. He created the initial managing partner corporations. He prepared the consulting agreements for the organization, assisted in changing the corporate names of the different ISOs, and attended the initial organizational meetings of the general partnerships with the initial managing partners. And he responded to investor questions. So to say, oh, he just wrote a letter and that's it, it's just not true. It's just not true. And I think the antagonism is very clear from the record. It's very specific. Government elected not to retry him? Mr. Leonard, as far as I know, as far as I know, he's not facing retrial. I would submit to honors. Is that what happened? That's not correct, Your Honor. Mr. Leonard was under indictment in the state of New York, actually the eastern district of New York, and we deferred doing anything until that trial. That trial hung. He's now being retried in that district, I believe, this month or next. And once that case is resolved, we'll decide what to do with anything in our district. We never did talk very much about the sentencing issue. You both agree it should be resentenced? I'm sorry, I didn't get to that, Your Honor. I apologize. We believe a limited remand is appropriate. We don't believe a full remand is. Well, if the judge – it's almost a technical difference, isn't it? I think that's correct from a district court's perspective. If he thinks that it should be resentenced, that's what he's going to do. All right. That's what I thought. Thank you, Your Honor. Thanks. Thanks.
judges: Pregerson, Leavy, Beistline